The Honorable David Bisbee State Senator 14068 Pyramid Drive Rogers, Arkansas 72758-0116
Dear Senator Bisbee:
This is in response to your request for my opinion on various questions relating to the rights of public schools over radio broadcasts of school events. Specifically, you have asked me to address the following questions:
 1. May a public school award to a radio station exclusive radio broadcast rights to air school events? If so, can exclusive broadcast rights be granted for both events at which an admission fee is charged and events that are open to the public at no charge?
 2. If a public school awards exclusive radio broadcast rights, can the public school prohibit another radio station from:
a) broadcasting a portion of the event as part of its news coverage;
b) broadcasting a program of event highlights;
c) airing a delayed broadcast; or
d) recording the event and selling tapes to the public?
 3. If a public school awards exclusive radio broadcast rights over sports events, can the public school prohibit another local radio station from airing a competing broadcast of a game through a contract with the other school involved in the contest? Would it make a difference whether the event is a home or away game?
RESPONSE
In my opinion, the answer to both parts of your first question is "yes." With respect to the first part of your second question, I do not believe a school can prohibit a broadcaster from airing portions of an event as news coverage. I cannot definitively answer the remaining parts of this question, which raises factual issues I am not authorized or equipped to address. However, I can set forth the standard to be applied in addressing these questions. Finally, I believe the answer to both parts of your final question is "yes."
Question 1: May a public school award to a radio station exclusive radiobroadcast rights to air school events? If so, can exclusive broadcastrights be granted for both events at which an admission fee is chargedand events that are open to the public at no charge?
By statute, every school district is a body corporate invested with the power to enter into contracts. A.C.A. § 6-13-102. The scope of this power is statutorily defined as extending to all things "necessary and lawful" in the running of public schools. A.C.A. § 6-13-620. In Ark. Op. Att'y Gen. No. 99-348, I interpreted this standard as permitting a school district to undertake any "reasonably useful and proper" actions to achieve its mission. I further pointed out that courts can interfere with a school district's decisions only upon a showing of clear abuse of discretion. Safferstone v. Tucker, 235 Ark. 70, 357 S.W.2d 3 (1962).
In my opinion, a school district may adopt any policy that is reasonable with respect to the broadcasting of school events. In theory, a school might reasonably determine, for instance, that contracting with a radio station to exclusively air school events is economically advantageous. Alternatively, a school might simply prefer the coverage provided by a particular broadcaster and elect to limit the airing of its events to that station. So long as this decision is made in good faith and is reasonable, I see no basis for a challenge.
Your question is ambiguous in that it is unclear whether your phrase "exclusive radio broadcast rights to air school events" means "rights to broadcast school-sponsored events" (as in a radio concert) or "rights to provide coverage of school-sponsored events" (as in a radio account of a football game). However, this ambiguity is insignificant since both "rights" are actually licenses that the school may grant or not as it wishes. It is beyond dispute that any expressive activity or entertainment is in itself copyrightable as intellectual property.17 U.S.C. § 106. Moreover, as my predecessor pointed out in Ark. Op. Att'y Gen. No. 87-112, the right to broadcast an event is likewise a saleable variety of property — a conclusion that follows from the fact that the event being broadcast initially "belonged" to the school district, which has conveyed a measure of control over its property by licensing it to the broadcaster. Finally, the broadcast itself, to the extent it involves any element of expression, is likewise a copyrightable item of intellectual property, although this expression is inextricably interwoven with the event being broadcast.[1] Given that the very notion of ownership implies control, it follows that a school district, as the "owner" of school events, may contract with any or no broadcasters for the airing of such events.
Underlying your request appears to be some concern that restricting the broadcasting of public school events might infringe on a broadcaster's First Amendment right of expression. I do not believe this concern is warranted. Admittedly, a radio broadcaster's descriptive account of a school activity is a form of expression. However, school property is not a traditional public forum for unbridled business activity that merely happens to involve expression, and school districts are consequently justified in reasonably restricting such activity. See, e.g.,International Society for Krishna Consciousness v. Lee, 505 U.S. 672,677-79 (1992). Significantly, educational institutions frequently enter into arrangements for the exclusive broadcast of sporting events. Indeed, the legislature had to enact special legislation in order to afford all radio broadcasters equal access to Arkansas Razorback football and basketball games. A.C.A. § 6-64-104; see Ark. Op. Att'y Gen. 87-112
(opining that this legislation is constitutionally valid). No comparable statute applies to school districts, and no principle of common or constitutional law would compel a school district to permit a broadcaster to conduct its commercial activity on school property.
In my opinion, this conclusion applies regardless of whether the school charges admission for the event at issue. In either instance, the school is admitting the public for the limited purpose of viewing the event, not for the purpose of conducting business. The mere fact that the school has contracted with one business to broadcast the event does not mean that every other broadcaster is licensed to do so.
Question 2: If a public school awards exclusive radio broadcast rights,can the public school prohibit another radio station from: (a)broadcasting a portion of the event as part of its news coverage; (b)broadcasting a program of event highlights; (c) airing a delayedbroadcast; or (d) recording the event and selling tapes to the public?
This question in fact contains four questions, which I will address in turn. In my opinion, the answer to subsection (a) of this question is "no." As the Supreme Court noted in Regan v. Time, Inc., 468 U.S. 641,704:
 Pursuant to the express authority of Art. I, § 8, of the Constitution, Congress established a copyright which generally vests the exclusive right to reproduce original works with the author of the work. 17 U.S.C. § 106. One who infringes that right by reproducing the work, see § 501(a), is subject to criminal prosecution, see § 506. This broad prohibition, however, is qualified. Individuals may make a "fair use" of the copyrighted works "for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research. . . ." § 107 (emphasis added).
I believe the fair use exception would support presenting as news items either excerpts of the game recorded directly by the news broadcaster or excerpts from the exclusive broadcast of the event in its entirety.
The question becomes somewhat more complicated when the issue is broadcasting a program of event highlights. Determining whether such use is "fair" will necessarily entail conducting a factual inquiry of the sort I am neither authorized nor equipped to undertake. However, I can recite what will be the parameters of this inquiry. As one federal court has remarked:
 The cases emphasize that resolution of a fair use claim "depends on an examination of the facts in each case (and) cannot be determined by resort to any arbitrary rules or fixed criteria." Meeropol v. Nizer, 560 F.2d 1061, 1068 (2d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). Evolution of the doctrine in these cases, however, suggests four commonly recognized factors that have traditionally been consulted in fair use cases: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of material used in relation to the copyrighted work as a whole; and (4) the effect of the use on the copyright holder's potential market for the work. See 3 Nimmer on Copyright § 13.05(A) (1979); 17 U.S.C. § 107.
Iowa State University Research Foundation, Inc. v. American BroadcastingCompanies, Inc., 621 F.2d 57, 60 (2d Cir. 1980). As my predecessor pointed out in Ark. Op. Att'y Gen. No. 88-153, the last of these four factors is generally acknowledged as the most important. See, e.g.,Harper Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539
(1985).
In the present case, the use of excerpts as highlights would clearly be of a commercial nature. Moreover, to the extent airing such highlights would command an audience, doing so would appear to infringe on the property interests of the school district and/or the original broadcaster. The amount and substantiality of the excerpted highlights in relation to the event as a whole is undetermined. Only a finder of fact could determine whether such use amounted to an infringement. Any challenge to such use would be subject to the following allocation of burdens:
 It should be noted that if a particular use of copyrighted materials is challenged in a civil proceeding and the user claims the benefits of the "fair use exception," the user has the burden of proving the applicability of the exception. Robinson v. Random House, 877 F. Supp. 830 (S.D.N.Y. 1995); Rubin v. Brooks/Cole Pub. Co., 836 F. Supp. 909 (D.Mass. 1993); Association of American Medical Colleges v. Mikaelian, 571 F. Supp. 144 (D.Pa. 1983), aff'd
734 F.2d 6.
Ark. Op. Att'y Gen. No. 96-220.
The same approach would apply in gauging whether it would be permissible to air a delayed broadcast. Such use might be permissible if the original broadcaster had no intention of airing its own delayed broadcast, since the use would in no way injure the copyright owner. Again, finally determining whether such use would be "fair" would involve an intense inquiry into the facts.
Finally, as indicated above, I do not believe a broadcaster has any extra-contractual right to record a school event for commercial purposes. In my opinion, then, the district could prohibit a radio station from itself recording an event and selling tapes to the public. I further doubt that the station could simply copy the live broadcast and sell tapes to the public. In Sony Corp., the Supreme Court approvingly recited a district court's approach to this issue:
 The District Court concluded that noncommercial home use recording of material broadcast over the public airwaves was a fair use of copyrighted works and did not constitute copyright infringement. It emphasized the fact that the material was broadcast free to the public at large, the noncommercial character of the use, and the private character of the activity conducted entirely within the home. Moreover, the court found that the purpose of this use served the public interest in increasing access to television programming, an interest that "is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 102." Id., at 454. Even when an entire copyrighted work was recorded, the District Court regarded the copying as fair use "because there is no accompanying reduction in the market for `plaintiff's original work.'" Ibid.
464 U.S. at 425-26 (footnote omitted). Implicit in this passage is an acknowledgment that copying broadcasts for purely commercial purposes would not qualify as a "fair use" of copyrighted material.
Question 3: If a public school awards exclusive radio broadcast rightsover sports events, can the public school prohibit another local radiostation from airing a competing broadcast of a game through a contractwith the other school involved in the contest? Would it make a differencewhether the event is a home or away game?
I believe the answer to both parts of this question is "yes." Although it is conceivable that a school would contract with a broadcaster to provide exclusive broadcasts of both home and away games, nothing in that contract could bind another school to permit the broadcasting on its own property. As indicated above, if the host school has contracted with another broadcaster to provide exclusive coverage of its games, that school might prohibit competing broadcasters from airing the game. Absent some statute, express agreement or league directive that would oblige the home team host to provide broadcasters unrestricted access to events, I believe the home team host has discretion to impose reasonable restrictions.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP/JHD:cyh
[1] The courts have even found that television images of a live event such as a football game constitute "authorship" capable of being copyrighted, since the very act of recording involves some element of selection. See, e.g., National Association of Broadcaster v. CopyrightTribunal, 675 F.2d 367, 378 (D.C. Cir. 1982) (citing additional cases);Production Contractors, Inc. v. WGN Continental Broadcasting Co.,622 F. Supp. 1500, 1503-04 (N.D. Ill. 1985); Nimmer on Copyright,
§ 1.08[C][2], at 1-51. An event like a sports contest and a broadcaster's account thereof are typically considered a unitary item of intellectual property, prompting the court in National Association of Broadcasters to observe that "a copyrightable sports telecast is the joint creation of the broadcaster and sports club alike." 675 F.2d at 378 n. 17. Perhaps because of disputes regarding who owns the copyright under such circumstances (the team or the broadcaster), see id. at 377-78, the Copyright Act allows for the division of copyrights. 17 U.S.C. §§ 102,201(d)(2).